UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CLAYTON JAMES HANKS,                CIVIL NO. 15-4275 (JNE/DTS)

    Plaintiff,

v.                                  REPORT AND RECOMMENDATION

JASON HILLS;
NICHOLAS DESOTELLE,
DUSTIN ENGH;
MICHAEL MARCOTT;
LAWRENCE AMSDEN;
CHRIS SCHULTZ;
LUKE RICHLING;
TRISTA SHIELDS;
JOHANNES OLIVIER;
MELISSA COOK,
*n/k/a Melissa Freshwater;
each in their individual
and official capacities;* and
MINNESOTA DEPARTMENT
OF CORRECTIONS;

    Defendants.

---

Christopher Proczko, Esq. and Kirstin D. Kanski, Esq., Ballard Spahr LLP, 80 South Eighth Street, Suite 2000, IDS Center, Minneapolis, MN, for Plaintiff;

Steven Forrest, Esq., Minnesota Attorney General's Office, 445 Minnesota Street, Suite 900, St. Paul, MN, for Defendants.
_____

## INTRODUCTION

Plaintiff Clayton James Hanks ("Hanks") alleges Defendants violated his constitutional rights and committed various common law torts in connection with their response to Hanks' self-inflicted injury on December 25, 2014. Defendants seek summary judgment on the constitutional claims. For the reasons that follow, the Court

recommends that Defendants' Motion for Summary Judgment [Docket No. 157] be granted.

## FINDINGS OF FACT

### 1. Background

Following his convictions for burglary and terroristic threats, Hanks entered the Minnesota Correctional Facility in St. Cloud on July 1, 2014. *Hanks v. State*, No. A16-1821, 2017 WL 2333051, at *1 (Minn. Ct. App. May 30, 2017), *rev. denied* (Minn. Aug. 22, 2017); Wherley Aff. ¶ 2, Docket No. 189. On July 15, 2014, following two incidents of self-injurious behavior, Hanks was transferred to a Mental Health unit within the Minnesota Correctional Facility in Oak Park Heights ("MCF-OPH"). Wherley Aff. ¶¶ 3-5. The self-injurious behavior continued at MCF-OPH, where Hanks repeatedly reopened a wound on his left forearm. Mayer Aff. ¶ 17, Docket No. 161. Hanks has been reinjuring the wound for over 20 years, rendering it difficult to suture. *Id.*; Paulson Aff. ¶¶ 20-21, Docket No. 168.

### 2. Hanks' Christmas Day Self-Injury

On Christmas Day 2014, Hanks purposely reopened his left forearm wound. Hanks Decl. ¶ 3, Docket No. 226. Hanks believes his injury was the deepest he had ever experienced. *Id.* ¶ 13. Hanks tried to alert prison guards to receive treatment, but his injury was dismissed as being old, and he was told to stop pressing his duress button and wait for the medical pill run. *Id.* ¶¶ 14-16. Hanks does not know which guards he spoke with. Hanks Supp. Answers to Defs. Interrogatories 2, Docket No. 234 Ex. B.

Several hours after the injury, Hanks gained the attention of Defendant Correctional Officer Luke Richling ("Officer Richling") and asked him to activate an

Incident Command System ("ICS"). *Id.* Before activating ICS, Hanks alleges, Officer Richling asked Hanks whether he wanted him to because "you know what is going to happen to you," which Hanks understood to mean being placed on a restraint board. Hanks Decl. ¶ 11, Docket No. 226. Richling acknowledges speaking with Hanks before activating ICS, but cannot recall what he said. Richling Depo. 82, Docket No. 221-1. In any event, Richling activated ICS within minutes of his interaction with Hanks. Hanks Supp. Answers to Defs. Interrogatories 3, Docket No. 234 Ex. B. Upon activation, ICS triggers an emergency response team consisting of correctional officers who are trained to handle situations such as a self-injurious inmate. Hills Decl. ¶ 5, Docket No. 181.

The response team was led by Defendant Lieutenant Jason Hills ("Lieutenant Hills"). Hills Depo. 104, 113, Docket No. 221-1. Lieutenant Hills and the rest of the team quickly arrived at Hanks' cell to transport him to the Nurse's office. *Id.* According to Hanks, team members said they would teach him a lesson and get him to "stop doing that shit," complained that Hanks was making them complete paperwork on Christmas, and taunted Hanks about the prospect of being placed on the restraint board. Hanks Decl. ¶ 2, Docket No. 226; Hanks Answers to Defs. Interrogatories 3, Docket No. 234 Ex. A. Hanks is unable to identify which officers made the statements because he could not see them. Hanks Answers to Defs. Interrogatories 3, Docket No. 234 Ex. A.[1]

---

[1] While Hanks was being transported to the Nurse's Office, one of the correctional officers began filming their interaction with Hanks. Hanks Videos 1 and 2, Docket No. 227 Ex. 1A, 1B. The first video captured without interruption the 24 minutes from when Hanks was transported to the Nurse's Office to his placement on the restraint board. The second video shows the 13 minutes between when Hanks was taken off the restraint board until his return to his prison cell. Hanks Video 1, Docket No. 227 Ex. 1A; Hanks Video 2, Docket No. 227 Ex. 1B.

### 3. Hanks' Medical Care

Less than a minute after being led from his cell, Hanks arrived at the Nurse's office. Hanks Video 1 0:27-1:07, Docket No. 227 Ex. 1A. There he was greeted by Registered Nurse Johannes Olivier ("Nurse Olivier"), who was the charge nurse that evening responsible for medical emergencies, and Nurse Melissa Cook *née* Freshwater ("Nurse Cook") who was still undergoing training as a licensed practical nurse and was shadowing Nurse Olivier as part of her orientation. Reid Aff. ¶¶ 7-8, Docket No. 164. Nurse Olivier assessed Hanks and determined Hanks was no longer bleeding and was not in danger of going into shock. Olivier Aff. ¶¶ 9-10, Docket No. 166. Nurse Olivier then checked Hanks' wound and cleaned it with gauze and antibacterial and saline solutions. *Id.* ¶ 11. When Hanks asked to be taken to the hospital, Hanks claims "Lieutenant Hills or one of the other offices [sic] immediately said 'no.'" Hanks Decl. ¶ 19, Docket No. 226. Hanks repeated his request to go to the hospital several times. *Id.* ¶ 21. While Hanks claims the cut was so deep that tendons were visible, Nurse Olivier determined Hanks' cut was largely superficial and could be initially treated and protected against infection with wet to dry dressings without additional emergency care. Hanks Decl. ¶ 13, Docket No. 226; Olivier Aff. ¶¶ 10-12, Docket No. 166. Nurse Olivier was familiar with Hanks' medical history and his past acts of self-harm. Olivier Aff. ¶¶ 7, 12, Docket No. 166. Nurse Olivier alone had the authority to decide whether Hanks needed additional medical care. Mayer Aff. ¶ 14, Docket No. 161.

Nurse Olivier informed Lieutenant Hills that Hanks did not need to immediately go to the hospital and instead arranged for Hanks to be seen by a Department of Corrections' doctor the next day. Olivier Aff. ¶¶ 14-16, Docket No. 166. This interaction is not captured in the incident's video, and Nurse Olivier is unsure when he told

4

Lieutenant Hills.  *Id.* ¶ 15.  In lieu of hospitalization, Nurse Olivier wrapped Hanks' wound with wet to dry dressing.  *Id.* ¶ 12.  Nurse Olivier's decision was consistent with his training, which instructed that sutures could be applied successfully any time within a 48-hour window following such an injury and that wet to dry dressing was appropriate in the interim.  Mayer Aff. ¶ 31, Docket No. 161.  Hanks claims that despite this being the most severe wound he had ever inflicted on himself, it was the only time staff refused to have his arm seen by a doctor.  Hanks Decl. ¶ 24, Docket No. 226.

### 4. The Restraint Board

Immediately following Nurse Olivier's treatment, Lieutenant Hills authorized Hanks' placement on the restraint board.  Hills Aff. ¶ 11, Docket No. 181. The restraint board is used to prevent inmates from committing self-injury and suicide.  Gau Depo. 127, Docket No. 205.  Lieutenant Hills, who was the only person present with the authority to have Hanks placed on the board, claims he did so in order to prevent further injury.  Hills Aff. ¶ 11, Docket No. 181.  Nurse Olivier medically cleared Hanks to be placed on the board.  Olivier Aff. ¶ 17, Docket No. 166.  Following Hanks placement on the board, Lieutenant Hills consulted Sharlene Lopez, the on-call psychologist, who did not object to Hanks' board placement.  Lopez Aff. ¶ 17, Docket No. 195.

Hanks disputes Lieutenant Hills' justification for placing him on the restraint board.  According to Hanks, prior to Hanks' medical evaluation, Lieutenant Hills replied "yup" when asked by an unidentified person whether to prepare the restraint board.  Hanks Supp. Answers to Defs. Interrogatories 5, Docket No. 234 Ex. B.  Hanks claims, and witnesses confirm, he was compliant throughout his medical treatment.  *Id.;* Cook Depo 117-18, Docket No. 221-1.  The video of Hanks' medical treatment captures a woman's voice, who Hanks identifies as either Nurse Cook or Defendant Officer Trista

5

Shields ("Officer Shields"), saying, without context, "but he doesn't need it." Hanks Supp. Answers to Defs. Interrogatories 4, Docket No. 234 Ex. B. Moreover, following the incident, guards questioned why Hanks was not taken to the hospital. Shields Depo. 77-78, Docket No. 221-2. Taken together with the earlier "threat" by Officer Richling and the comments by other officers that they would teach Hanks a lesson, Hanks argues he was placed on the board, not to protect against self-injury, but as retaliation for having injured himself so as to inconvenience the officers. Hanks Decl. ¶ 3, Docket No. 226.

In addition, Hanks alleges that officers continued to mistreat him as detailed below. Following his placement on the restraint board, Hanks was informed he would be checked every 30 minutes to evaluate whether he would comply with officers' instructions and not injure himself further. Hills Aff. ¶ 15, Docket No. 181. As he was placed on the board, Hanks recalls officers yanking on the straps, cutting into his skin. Hanks Decl. ¶ 4, Docket No. 226. The pain from the restraint board was "excruciating" and the straps were the tightest Hanks had ever experienced. *Id.* ¶ 26. When Hanks sought to have the straps loosened, they were tightened further. *Id.* ¶ 27. Nurse Olivier claims he immediately checked the tightness of Hanks' straps, and did so regularly while Hanks was restrained, and never found them to be too tight. Olivier Aff. ¶ 18, Docket No. 166; Restraint Board Log, Docket No. 194 Ex. B.

While on the board, Hanks recalls "convulsing and seizing and not being able to move or breathe well or talk at times." Hanks Decl. ¶ 8, Docket No. 226. Hanks told Nurse Cook of sharp pain in his leg and numbness in his arm, but he did not recall her responding. Hanks Supp. Answers to Defs. Interrogatories 8, Docket No. 234 Ex. B. Hanks' requests to use the bathroom were denied and he urinated while on the board.

6

Hanks Decl. ¶ 27, Docket No. 226. Hanks further informed guards he was having a seizure, but no action was taken. *Id.* When asked by guards whether he would continue hurting himself, Hanks always replied no, but he was not removed from the board. Hanks Answers to Defs. Interrogatories 8, Docket No. 234 Ex. A. Nurse Olivier claims Hanks was unresponsive to questions, was noncompliant by wresting his head from the straps, and that regular checks of Hanks' body showed his straps were not too tight, his bandages were secure and he had proper circulation. Olivier Aff. ¶ 18, Docket No. 166.

Hanks was removed from the board when guards decided Hanks had demonstrated sufficient good behavior to indicate he was ready to comply with directives, two hours and 44 minutes after he was placed on it. Restraint Board Log, Docket No. 194 Ex. B. Upon his removal, Hanks alleges he was not allowed to clean himself despite being covered in urine and vomit. Hanks Answers to Defs. Interrogatories 8, Docket No. 234 Ex. A. Hanks was brought to Nurse Olivier's office, where his wound was reassessed and cleaned and his bandages were reapplied. Olivier Aff. ¶ 21, Docket No. 166. As a result of being placed on the board, Hanks alleges he suffered severe emotional distress, severe depression, feelings of helplessness, shame and embarrassment, post-traumatic stress disorder, skin abrasions from the straps, arthritis in his neck, reopening of, and pain in, his existing wounds, lock jaw complications, and permanent nerve damage in his left arm. He alleges these injuries were unnecessarily increased as the result of the delay in medical treatment. Hanks Answers to Defs. Interrogatories 15, Docket No. 234 Ex. A. Hanks has never regained full use of his arm since the incident. Hanks Decl. ¶ 30, Docket No. 226.

Initially Hanks was unable to identify the officers with whom he interacted while on the restraint board because the straps impaired his vision and he was not wearing glasses. Hanks Answers to Defs. Interrogatories 8, Docket No. 234 Ex. A. Later, however, Hanks recalled telling "Officer Moua Herr[2] and Nurses Johanna Olivier and Melissa [Cook] specifically of his complaints while he was on the board but there may have been other officers." Hanks Supp. Answers to Defs. Interrogatories 8, Docket No. 234 Ex. B. Hanks further recalled "advising the nurses and officers that he had suffered a seizure and had vomited in his mouth and swallowed most of the vomit." *Id.* Finally, to the "best of his ability," Hanks remembered "advising Moua Herr and [Nurse Cook] after the seizure occurred." Hanks Supp. Answers to Defs. Interrogatories 10, Docket No. 234 Ex. B.

Following the incident, MCF-OPH Security Captain Steven Ayers reviewed the incident reports and video footage from the evening and determined that the use of force was appropriate. Ayers Aff. ¶ 8, Docket No. 192. Collin Gau, the Assistant Commissioner of the Minnesota Department of Corrections, also reviewed the video and likewise concluded that the officers' actions complied with DOC policy. Gau Depo. 212-13, Docket No. 205.

### 5. December 26, 2014 Medical Evaluation

On December 26, 2014, Hanks' arm was evaluated by Department of Corrections Doctor Stephen Craane ("Dr. Craane"). Paulson Aff. ¶ 28, Docket No. 168. Dr. Craane examined the wound and prescribed antibiotics. *Id.* ¶ 31. Hanks claims Dr. Craane told his assistant that Hanks should have been immediately taken to the hospital because he was now no longer capable of having sutures. Hanks Supp.

---

[2] Officer Herr is not a defendant in this case.

Answers to Defs. Interrogatories 11, Docket No. 234 Ex. B. Dr. Craane's assistant, Registered Nurse Kathryn Reid ("Nurse Reid"), denies Hanks' allegations "unequivocally." Reid. Aff. ¶ 25, Docket No. 164. Dr. Craane claims that, had he been concerned about Hanks' treatment, he would have noted it in his practitioner notes and contacted his superiors, which he did not. Craane Aff. ¶ 6, Docket No. 179. Thereafter, Dr. Craane frequently examined Hanks and reapplied wet to dry bandages to his wound until it closed on February 3, 2015. Paulson Aff. ¶¶ 30-32, Docket No. 168.

### 6. Procedural History

On December 2, 2015, Hanks sued multiple correctional officers, including Lieutenant Hills and Officer Richling, arguing their placement of Hanks on the restraint board was cruel and unusual punishment and the failure to have Hanks immediately sent to the hospital was denial of necessary medical care. Hanks also sued the same officers for assault, battery, and intentional and negligent infliction of emotional distress under Minnesota state law. Lastly, Hanks sued Nurse Olivier and Nurse Cook, alleging their treatment of Hanks' wound was deliberate indifference to his medical condition.

As is readily apparent from the foregoing, factual disputes regarding this incident abound. Despite these factual disputes, this Court finds that Hanks cannot maintain his constitutional claims for the reasons set forth below.

## CONCLUSIONS OF LAW

### I. Standard of Review

Summary judgment is proper if there is no genuine issue as to any *material* fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In resolving this motion for summary judgment, the Court must view all facts and all reasonable inferences from them in the light most favorable to Hanks. *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018). There must be "enough evidence to allow a rational trier of fact" to find for Hanks on the required elements of his claims. *Id.*

## II.     Hanks' Claims Against Officers Desotelle, Engh, Marcott, Amsden, Schultz, Shields and Richling

In order to sustain a claim under 42 U.S.C. § 1983, Hanks must plead as to each defendant that he or she has *personally* violated his constitutional rights. *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014); *Mayorga v. Missouri*, 442 F.3d 1128, 1132 (8th Cir. 2006). A § 1983 claim that lacks factual allegations detailing a defendant's personal involvement cannot withstand summary judgment. *Hester v. Redwood Cty.*, 2012 WL 863730, at *5 (D. Minn. Mar. 13, 2012).

Hanks sued ten defendants in their individual capacity: Lieutenant Hills, Officer Richling, Officer Shields, Nurse Olivier, Nurse Cook and Correctional Officers Nicholas Desotelle, Dustin Engh, Michael Marcott, Lawrence Amsden, and Chris Schultz. Am. Compl., Docket No. 116. Officers Desotelle, Engh, Marcott, Amsden and Schultz are not named in Hanks' summary judgment opposition memorandum and specific allegations were not levied against them individually in Hanks' Amended Complaint. *Id.*; Opp'n. Mem., Docket No. 220. Rather, Hanks refers to all of the officers collectively as "defendants," which lacks the specificity necessary to sustain his claim. *Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999). Hanks' vagueness is unsurprising as he admitted multiple times that he was unable to specifically identify which officers were involved during the incident. Hanks Answers to Defs. Interrogatories 4, 8, Docket No. 234 Ex. A.

10

Though Hanks has alleged that officers ignored his repeated requests for help, he has not identified those officers. Because Hanks has not borne his burden to make specific allegations against Officers Desotelle, Engh, Marcott, Amsden and Schultz, these officers are entitled to summary judgment.

Hanks' claims against Officer Shields are similarly infirm. The closest Hanks comes to making an allegation specific to Officer Shields is his assertion that *either* Officer Shields *or* Nurse Cook said Hanks did not need to be placed on the board. Hanks Supp. Answers to Defs. Interrogatories 4, Docket No. 234 Ex. B. But Hanks admitted that the voice sounded more like Nurse Cook and he wasn't really sure who said it. *Id.* Quite simply, Hanks' uncertain attribution to Officer Shields is not specific enough to sustain a § 1983 claim against her. Accordingly, Officer Shields is also entitled to summary judgment.

Hanks has likewise failed to sufficiently allege conduct by Officer Richling. By Hanks' account, Officer Richling responded promptly to his self-injury. Hanks Supp. Answers to Defs. Interrogatories 3, Docket No. 234 Ex. B. Prior to activating ICS, Hanks alleges Officer Richling issued a veiled threat that ICS activation would lead to his punishment on the restraint board. Hanks Decl. ¶ 11, Docket No. 226. But following Officer Richling's alleged threat, the record is devoid of any information that establishes his further involvement. While Hanks was indeed placed on the board, the undisputed record demonstrates it was Lieutenant Hills, not Officer Richling, who made that decision. Richling Depo. 93-94, 99, Docket No. 221-1; Hills Aff. ¶ 11, Docket No. 181. Therefore, Hanks' claims against Officer Richling – that his utilization of the restraint board was cruel and unusual punishment and that his failure to override Nurse Olivier's

decision not to send Hanks immediately to the hospital – are not supported by any specific evidence. Hanks' claims as to Officer Richling must be dismissed.

### III.  Claims Against Lieutenant Hills

Hanks alleges Lieutenant Hills inflicted cruel and unusual punishment and unconstitutionally denied Hanks medical care by placing Hanks on the restraint board rather than sending him to the hospital. Lieutenant Hills admits he authorized Hanks' placement on the restraint board, but asserts he did so to prevent further self-injury. Hills Aff. ¶ 11, Docket No. 181. Lieutenant Hills also acknowledges that he did not have Hanks sent to the hospital, but asserts he simply deferred to the medical judgment of Nurse Olivier. Hills Depo. 106-07, Docket No. 221-1.

#### A. Excessive Force: Placement on the Restraint Board

Because the record establishes that it was Lieutenant Hills who made the decision to use the restraint board, the claims against him are not barred for lack of specificity. However, the allegation Hanks levies against Lieutenant Hills is, essentially, that he had Hanks placed on the restraint board without penological justification. Hanks does not allege that Lieutenant Hills himself personally over-tightened (or authorized the over-tightening of) the straps or was in any other way involved in the implementation of Hanks' placement on the restraint board. After Hanks' initial placement on the restraint board, Lieutenant Hills did not interact with Hanks again that evening. Hills Aff. ¶ 17, Docket No. 181.

Lieutenant Hills argues that Hanks has not met his burden of establishing a prima facie case of excessive force and that Hanks' claims are barred by qualified immunity in any event. Def. Mem. 31-38, Docket No. 159. Because the Court finds Hills is entitled to qualified immunity, it will address that issue only. Qualified immunity protects

government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted). The qualified immunity standard affords Lieutenant Hills wide berth for mistaken judgments "by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). Qualified immunity is highly deferential. *Jackson v. Gutzmer*, 866 F.3d 969, 974 (8th Cir. 2017). In evaluating whether qualified immunity applies, we first consider whether any clearly-established constitutional right was violated and, if so, whether that right was clearly established when the alleged injury occurred. *Pearson*, 555 U.S. *at* 231. The claims against Lieutenant Hills can only proceed if he violated a clearly-established right and should have been aware that that right existed. *Id.* Therefore, the question is whether Lieutenant Hills' decision to have Hanks placed on the restraint board was unconstitutional and, if so, whether Lieutenant Hills should have known it was unconstitutional.

The Eighth Circuit recently granted qualified immunity to a correctional officer who authorized use of a restraint board, holding that use of a restraint board in response to self-injurious behavior is constitutionally permissible if it helps preserve internal order and discipline, and is not done in a repugnant and dangerous manner:

> Qualified immunity is an affirmative defense governed by an objective standard in which "the defendant's subjective intent is simply irrelevant." *Crawford-El*, 523 U.S. at 588, 118 S.Ct. 1584. "The immunity standard in Harlow itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law." *Id.* at 592, 118 S.Ct. 1584. Thus, just as an arresting officer with probable cause to arrest for a particular violation is entitled to qualified immunity even if that was not his motive at the time of arrest,

13

> *see Peterson v. Kopp*, 754 F.3d 594, 599-600 (8th Cir. 2014), Gutzmer is entitled to qualified immunity if the totality of the circumstances justified use of the restraint board even if Gutzmer erred in believing Jackson was self-injurious when placed on the board.
>
> …
>
> Jackson argues that, when he was placed on the restraint board, there was no longer a risk of self-injurious behavior, so the evidence demonstrates that Gutzmer placed Jackson on the restraint board "as punishment for seeking medical attention," thereby violating the Eighth Amendment. But punishing an inmate "to preserve internal order and discipline and to maintain institutional security" does not violate the Eighth Amendment, *Hudson*, 503 U.S. at 6, 112 S.Ct. 995, unless the punishment or force used is "repugnant to the conscience of mankind," id. at 10, 112 S.Ct. 995 (quotation omitted), like the "degrading and dangerous" hitching post restraint at issue in *Hope v. Pelzer*, 536 U.S. 730, 745, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

*Jackson v. Gutzmer*, 866 F.3d 969, 976 (8th Cir. 2017). Thus, if the totality of circumstances justified Hanks' placement on the board and its usage was not "repugnant to the conscience of mankind," Lieutenant Hills is entitled to qualified immunity. *Id.*

Here, Lieutenant Hills was aware of Hanks' history of self-harm, saw that Hanks was largely non-responsive while receiving treatment, and had been told by Nurse Olivier there was no medical reason Hanks could not be placed on the board. Hills Depo. 113, Docket No. 221-1; Hills Aff. ¶ 11, Docket No. 181; Olivier Aff. ¶ 17, Docket No. 166. Lieutenant Hills had also been trained that self-injurious inmates often reinjure their wounds immediately after being placed back in their cell following medical treatment. Ayers Aff. ¶ 13, Docket No. 192. Given these circumstances, it was not unreasonable for Lieutenant Hills to have Hanks restrained until the correctional officers

14

were reasonably assured that Hanks would no longer harm himself. Hills Aff. ¶ 8, Docket No. 181.

Hanks argues that Hills' motivation for placing him on the restraint board was not to prevent further injury but simply in retaliation for the inconvenience Hanks' injury caused the officers. Certainly, given the state of the record, Lieutenant Hills' motivation is in dispute and a reasonable jury could find that Lieutenant Hills' true motivation was spite. But, even if Lieutenant Hills' real motivation for placing Hanks on the board was an improper one, Lieutenant Hills' subjective intent is not relevant if his decision was objectively reasonable. *Crawford-El v. Britton*, 523 U.S. 574, 588-89 (1998). Nor does it matter whether using the restraint board violates prison regulations, as there is no constitutional right to having prison officials follow prison regulations. *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003). And while some of the allegations Hanks makes regarding his board treatment, including ignoring his seizures and cutting his skin by overtightening the straps, are repugnant and dangerous, those allegations are not specific to Lieutenant Hills (or any other identified officer), and "it is well settled the doctrine of respondeat superior is inapplicable to section 1983 claims." *Vaughn v. Greene Cty.*, Ark., 438 F.3d 845, 851 (8th Cir. 2006). For these reasons, Lieutenant Hills' use of the restraint board is subject to qualified immunity.

### B.     Deliberate Indifference Claim

Lieutenant Hills is also entitled to qualified immunity on Hanks' deliberate indifference claim. Failure to provide medical care to a prisoner is unconstitutional when the plaintiff shows that he had an objectively serious medical need and the defendant knew of, but disregarded, that need. *Hines v. Anderson*, 547 F.3d 915, 920 (8th Cir. 2008). Lieutenant Hills did not fail to provide medical care if he acted

15

reasonably, even if "through hindsight is found to have acted incorrectly." *Id.* Here, the record establishes that Hanks was immediately examined by Nurse Olivier but did not see a doctor until the next day. Because Hanks' claim is that Lieutenant Hills delayed the provision of appropriate medical care, Hanks "must place verifying medical evidence in the record to establish the detrimental effect" of that delay. *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (quotations omitted). Here, the record lacks any verifying medical evidence that Hanks suffered an injury as a result of not seeing a doctor until the next day. Thus, Hanks cannot establish his deliberate indifference claim.

It bears mentioning that Hanks alleges actions that would likely not be subject to qualified immunity. These include his accusations that his initial cries for help were ignored and that his straps were maliciously over-tightened. But as already discussed, Hanks did not make these allegations against a specific defendant. The Court, therefore, cannot permit those claims to proceed as constitutional torts.

## IV.    Claims Against Nurses Olivier and Cook

Hanks alleges that Nurses Olivier and Cook's treatment of his wound amounted to deliberate indifference to a serious medical need. Am. Compl. 16-17, Docket No. 116. To prove deliberate indifference, Hanks must show that he suffered from an objectively serious medical need and that Nurses Olivier and Cook knew of but deliberately disregarded that need. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997). An objectively serious medical need is evidenced through a doctor's diagnosis or must be obvious to a layperson. *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). Hanks must show "more even than gross negligence" because "disagreement with

treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

Hanks alleges that Nurses Olivier and Cook's decision to bandage his arm with wet to dry dressing rather than have him immediately sent to the hospital violated his Eighth Amendment rights. Am. Compl. 7-8, 17, Docket No. 116. As noted, because Hanks *was* seen by Dr. Craane the next day, the deliberate indifference claims stems not from a failure to receive treatment, but rather a *delay* in receiving treatment from a doctor. Hanks' theory is that this delay resulted in his wound not being able to be sutured. In order to succeed on a deliberate indifference claim premised on delay, Hanks must produce "verifying medical evidence in the record to establish the detrimental effect of delay." *Crowley*, 109 F.3d at 502. Verifying medical evidence typically takes the form of expert testimony. *Coleman v. Rahija*, 114 F.3d 778, 785 (8th Cir. 1997); see also *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006)("to avoid summary judgment an inmate alleging that a delay in treatment constitutes a constitutional deprivation must produce medical evidence to establish that the delay had a detrimental effect."). Failure to provide verifying medical evidence "precludes a claim of deliberate indifference to medical needs." *Coleman*, 114 F.3d at 784.

Hanks has not provided medical evidence to establish the delay in his treatment had a detrimental effect on his wound. The closest he gets to such evidence is his allegation that Dr. Craane told Nurse Reid that Hanks should have seen a doctor immediately. Hanks Supp. Answers to Defs. Interrogatories 11, Docket No. 234 Ex. B. Both Dr. Craane and Nurse Reid deny he said that. Reid. Aff. ¶ 25, Docket No. 164; Craane Aff. ¶ 6, Docket No. 179. But even assuming this statement was made, it does not meet the evidentiary requirements that Hanks produce verifying medical evidence

17

that the delay caused actual harm. *Senty-Haugen v. Goodno*, 462 F.3d 876, 890 (8th Cir. 2006).

Hanks alleges that the delay in seeing a doctor caused his arm not to be sutured by Dr. Craane. While his arm was not sutured, there is no medical evidence that the delay caused an inability to suture the wound or that the failure to suture it caused some permanent injury. Paulson Aff. ¶ 21, Docket No. 168; Mayer Aff. ¶ 32, Docket No. 161. While a jury could certainly find Hanks' wound was a serious medical condition, it could not properly find, in the absence of expert medical testimony, that the delay in having the wound assessed by a medical doctor caused permanent harm. The only medical evidence in this record suggests that the outcome would not have changed had Hanks been seen immediately by a doctor. Paulson Aff. ¶¶ 21, 35, Docket No. 168; Mayer Aff. ¶ 36, Docket No. 161. Because Hanks has not provided medical evidence that the delay in seeing a doctor caused permanent harm, Nurses Olivier and Cook are entitled to summary judgment.[3]

## V. State Law Claims

Hanks also alleges that Lieutenant Hills and Officers Desotelle, Engh, Marcott, Amsden, Schultz, Richling and Shields committed assault, battery, and intentional and negligent infliction of emotional distress. Am. Compl. 22-25, Docket No. 116. Because the Court recommends granting Defendants' summary judgment on all constitutional claims, the state law claims are all that remain. Under 28 U.S.C. § 1367(c)(3), this

---

[3] Hanks alleges that he told Nurses Olivier and Cook that he was strapped too tightly to the restraint board and that he had vomited and had a seizure, but they did not respond. Hanks Supp. Answers to Defs. Interrogatories 8, Docket No. 234 Ex. B. Though such allegations might support a cruel and unusual punishment claim, Hanks does not allege such a claim against Nurses Olivier fand Cook. Nor does he allege that their failure to respond while he was restrained on the board was denial of medical care.

Court may decline to exercise supplemental jurisdiction over the state law claims when all federal claims have been disposed, and the "normal practice" is to have them dismissed without prejudice.  *Stokes v. Lokken*, 644 F.2d 779, 785 (8th Cir. 1981). Federal courts should exercise judicial restraint and "avoid state law issues wherever possible."  *Condor Corp. v. City of St. Paul*, 912 F.2d 215, 220 (8th Cir. 1990). Accordingly, the Court recommends Hanks' state law claims be dismissed without prejudice.

## VI.  Conclusion

Hanks' lurid description of his treatment on December 25, 2014 raises legitimate questions as to whether his self-harm was properly addressed.  But absent allegations specific to the actions of each Defendant, and absent verifying medical evidence of the harm caused by his delay, the Court has no choice but to recommend that summary judgment be granted in favor of all Defendants on Hanks' constitutional claims.

### RECOMMENDATION

For the reasons set forth above, it is RECOMMENDED that Defendants' Motion for Summary Judgment [Docket No. 157] be GRANTED as follows:

1.  Hanks' federal claims against Defendants [Claims 1-3] should be DISMISSED WITH PREJUDICE;

2.  Hanks' state law claims against Defendants [Claims 4-7] should be DISMISSED WITHOUT PREJUDICE.

Dated:   May 1, 2018

*s/ David T. Schultz*
DAVID T. SCHULTZ
United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).